UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
***************************
UNITED STATES OF AMERICA,
        Plaintiff

vs.                                    Case No. 1:15-cr-10145-RGS

DEMETRIUS WILLIAMS et al,
        Defendants
***************************
UNITED STATES OF AMERICA,
        Plaintiff

vs.                                    Case No. 1:15-cr-10146-FDS

WILLIE BERRY et al,
        Defendants
***************************
```

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
AT BOSTON, MASSACHUSETTS
ON JULY 8, 2015

APPEARANCES:

For the Plaintiff:
Emily O. Cummings, Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210
617-748-3120

Transcriber:  Karen M. Aveyard,
              Approved Federal Court Transcriber

------------------------------------------------------

**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**
**www.transcriptionplus.com**

APPEARANCES (continued):

For Defendant Antonio Chatman:
John R. Salsberg, Esquire
221 Lewis Wharf
Boston, Massachusetts 02110
617-523-7788

For Defendant David Coke:
Mark D. Smith, Esquire
Laredo & Smith, LLP
101 Federal Street, Suite 650
Boston, Massachusetts 02110
617-443-1100

For Defendant Deronn Funches:
Kevin L. Barron, Esquire
15 Broad Street, Suite 240
Boston, Massachusetts 02109
617-407-6837

For Defendant Michael Gaines:
Inga S. Bernstein, Esquire
Rachel Stroup, Esquire
Zalkind Duncan & Bernstein
65A Atlantic Avenue
Boston, Massachusetts 02110
617-742-6020

For Defendant Sharod Hopkins:
James H. Budreau, Esquire
Bassil Klovee & Budreau
20 Park Plaza, Suite 1005
Boston, Massachusetts 02116
617-366-2200

For Defendant Sekou Williams:
James M. Caramanica, Esquire
8 North Main Street, Suite 403
Attleboro, Massachusetts 02703
508-222-0096

<u>I N D E X</u>

| Witness: | Direct | Cross |
|---|---|---|
| Detective Gregory Brown | | |
| (By Ms. Cummings) | 16 | |
| (By Mr. Barron) | | 26 |
| (By Mr. Salsberg) | | 32 |

<u>E X H I B I T S</u>

| No. | | Page |
|---|---|---|
| 1 | Investigation Report | 46 |

1                    P R O C E E D I N G S

2

3          THE CLERK:  The United States District Court for the

4    District of Massachusetts is now in session, the Honorable

5    Marianne B. Bowler presiding.  Today is Wednesday, July 8,

6    2015.  The case of U.S. v. Funches et al, Criminal Action

7    Nos. 15-10145 and 10146, will now be heard.

8          Will counsel please identify themselves for the

9    record.

10          MS. CUMMINGS:  Good morning, your Honor.  Emily

11    Cummings on behalf of the United States.

12          THE COURT:  Thank you.

13          MR. BUDREAU:  Your Honor, James Budreau on behalf of

14    Sharod Hopkins.  Good morning.

15          THE COURT:  Thank you.

16          MR. BARRON:  Kevin Barron for Deronn Funches.

17          THE COURT:  Thank you.

18          MR. BARRON:  Good morning, your Honor.

19          THE COURT:  Good morning.

20          MR. SALSBERG:  John Salsberg for Antonio Chatman.

21          THE COURT:  Thank you.

22          MS. BERNSTEIN:  Good morning.  Inga Bernstein for

23    Michael Gaines.  With me is Rachel Stroup.

24          THE COURT:  Thank you very much.

25          MR. CARAMANICA:  Good morning.  Jim Caramanica for

1    Sekou Williams.

2              THE COURT:  Thank you.

3              MR. SMITH:  Good morning, your Honor.  Mark Smith for

4    David Coke.

5              THE COURT:  Thank you very much.

6              Well, we're here for a continued detention hearing.

7    Are the parties ready to proceed?

8              Have there been any agreements to date or?

9              MS. CUMMINGS:  I believe some of the defendants are

10   taking voluntary detention, one may be getting continued to a

11   later date, and I'm not clear on where the others stand, your

12   Honor.

13             THE COURT:  All right.  So if your client is

14   interested in voluntary detention at this time, I'd like to

15   hear from you at the outset.

16             MR. BUDREAU:  Your Honor, James Budreau on behalf of

17   Sharod Hopkins.  We are agreeing to voluntary detention at this

18   point.

19             THE COURT:  All right.  I will enter an order of

20   voluntary detention without prejudice --

21             MR. BUDREAU:  Thank you.

22             THE COURT:  -- and I'll give you a prompt hearing if

23   you come up with a bail package.

24             MR. BUDREAU:  Great.

25             MR. SMITH:  Yes, your Honor.  On behalf of David Coke,

1    we are agreeing to the same.

2           THE COURT:  All right.  The same order to enter.

3           MR. SMITH:  Thank you.

4           THE COURT:  Anyone else?

5           MS. BERNSTEIN:  Your Honor, on behalf of Michael

6    Gaines, we are doing the same.  We've tentatively selected July

7    23rd at 11 o'clock to proceed with the detention hearing.  If

8    that changes, we will be in touch with the court.

9           THE COURT:  All right.  And if your client needs to be

10   interviewed, you'll have the interview done before that date.

11          MS. BERNSTEIN:  We will, yes.  Thank you.

12          THE COURT:  All right.  So I would say those three

13   defendants, Defendants Gaines, Hopkins and David Coke, can be

14   removed from the courtroom at this time.

15          MS. BERNSTEIN:  Your Honor, I would ask that he be

16   permitted to stay so that he can see it is a matter relating to

17   his criminal case.

18          THE COURT:  All right, as to Mr. Gaines.

19          What about other counsel, do you want to be excused,

20   Mr. Smith, Mr. Budreau?

21          MR. SMITH:  Yes, we wish to be excused, your Honor.

22          THE COURT:  All right.

23          MR. BUDREAU:  Mr. Hopkins would prefer to stay.

24          THE COURT:  All right.  Then you too will stay,

25   Mr. Budreau.

1          MR. BUDREAU:  Thank you.

2          THE COURT:  All right.

3          MR. BUDREAU:  Can I call witnesses, your Honor?

4          THE COURT:  Yes.

5          All right.  Ms. Cummings, you're ready to proceed?

6          MS. CUMMINGS:  Your Honor, the Government is ready to

7    proceed, however, and I'm not certain I have everything, I have

8    not seen anything presented from Pretrial that poses a viable

9    package for release for any of the defendants.  I know the

10   Court's practice has been if there's no viable package

11   presented, to enter a voluntary order and wait until there is

12   one.  I don't know what we're doing in this respect.

13         THE COURT:  All right.  Well, let's take them in the

14   order in which they're listed.  Mr. Barron first.

15         MR. BARRON:  Good morning again, your Honor.

16         THE COURT:  Good morning.

17         MR. BARRON:  I'm speaking for Mr. Funches.

18         We have a suitable person, we feel, to have

19   Mr. Funches in the home on a bracelet.  It's Ms. Sherry Beane

20   (PHONETIC).  I understand that Pretrial is objecting because a

21   daughter living in the home had a juvenile record for

22   possession of a weapon, some sort of weapons offense, but this

23   was six years ago.  Otherwise, Ms. Sherry Beane herself doesn't

24   have a criminal record and she has a house that is not on

25   Section 8.  It seems that she's willing to allow a phone line

1    in with an electronic monitor.

2              THE COURT:  She doesn't have a landline at this time?

3              MR. BARRON:  But she will allow one to be put in.  She

4    said so specifically.

5              I have filed a letter from her, your Honor.  It's

6    Document 49, I believe.  Yes, it's an exhibit to the detention

7    memorandum I filed.

8              THE COURT:  Yes.

9              MR. BARRON:  But it's filed as a separate document,

10   No. 49.  The detention memorandum is 27.  The Jencks request is

11   26.

12             THE COURT:  You want to pull it up, Brendan.

13             MR. BARRON:  I know Probation, because of the weapons

14   violation of the daughter, doesn't think the house is suitable,

15   but we disagree.  I think that's his -- you know, we've come up

16   with as much as we can at this point to offer a safe package

17   for release that assures safety of any member of the public

18   should the Government prove that, and secondly, that he's not a

19   flight risk.

20             I've reviewed 200 pages of Jencks and Mr. Funches is

21   not mentioned in it.  He's mentioned once in the Affidavit for

22   Detention that the agent filed without a date or time.  It says

23   he bought drugs or would buy drugs from Yancey Williams, but it

24   doesn't tell us an amount or date, and that appears to be the

25   only mention of Mr. Funches in all the information I've gotten

1  so far.

2      Now, the Government may have intercepts and other

3  things that it may want to offer, but I haven't seen them at

4  this time.  So at least for our burden of going forward, I

5  would introduce the Government's Jencks because it shows the

6  investigation, it shows minimal involvement, and that's enough

7  to shift the burden back to the Government.

8      Thank you.

9      THE COURT:  All right.  I'm going to go through each

10  of the defendants and then I'll move to the Government.

11      So Mr. Caramanica?

12      MR. CARAMANICA:  Good morning, your Honor.

13      THE COURT:  Good morning.

14      MR. CARAMANICA:  With respect to Sekou Williams, I

15  would suggest similarly with respect to the Jencks discovery,

16  your Honor, I've reviewed -- I didn't count the pages, but

17  there were 86-some-odd reports.  The reports go quite a bit

18  into detail about controlled buys and things to that effect.

19  Mr. Williams is not mentioned as being present at any buy.

20  He's not mentioned as being a participant in any buy.  And

21  similarly, with respect to the Affidavit in Support of

22  Detention, he's mentioned in two instances:  One, I believe, in

23  the opening paragraph, and another one somewhere down the line

24  as being a family member.  Nothing specific with respect to any

25  criminal involvement.

1          With respect to a proposed plan, I had provided with

2   Probation the name of a person, a Nicole McCullough (PHONETIC),

3   who is fully employed, that Mr. Williams could reside with in

4   Hyde Park.  She has not been interviewed yet.  The relationship

5   between the parties is that the two share a five-year-old child

6   in common.  My understanding is the --

7          THE COURT:  Well, then it's premature.

8          MR. CARAMANICA:  It is.

9          THE COURT:  She needs to be interviewed.  So if you

10  can arrange to get that while you're here at Pretrial Services

11  today, you can arrange for her to be -- is she present in the

12  courtroom?

13         MR. CARAMANICA:  She is, your Honor.

14         THE COURT:  All right.  Well, possibly it can be done

15  today in your presence.

16         MR. CARAMANICA:  Thank you.

17         THE COURT:  All right.  So are you willing to take

18  voluntary detention without prejudice until we get this in

19  order?

20         MR. CARAMANICA:  Yes, your Honor.

21         THE COURT:  All right.  So voluntary detention without

22  prejudice.

23         All right.  Moving on to Mr. Salsberg.

24         MR. SALSBERG:  Good morning again, your Honor.

25         I didn't receive a report this morning from Pretrial.

1    I know that we met this morning at 8:30 with Susan Walls.  I

2    don't know if she --

3              THE COURT:  I now she was typing right to the last

4    moment.  She's at the back of the courtroom.

5              PROBATION OFFICER WALLS:  I have a report for you now.

6              THE CLERK:  (Inaudible.)

7              THE COURT:  I have it, yes.  I just received it.

8              Do you want a moment to review it?

9              MR. SALSBERG:  Please.  Thanks.

10             THE COURT:  All right.

11             (Pause.)

12             THE COURT:  Do you want to share your thoughts with

13   me, Mr. Salsberg?

14             MR. SALSBERG:  Yes, your Honor, if I may.

15             I reviewed all the Jencks material and Mr. Chatman's

16   name is not in there.  Apparently, additional discovery is

17   forthcoming and it may be that his name is going to come up

18   someplace.  After all, he got indicted, so we know that his

19   name will come up someplace.  I don't know what it is

20   specifically he is alleged to have done.  Mr. Chatman doesn't

21   know what the allegations are against him with any specificity

22   either.

23             He's been on probation since November of 2014 and it

24   appears as though part of the determination as to whether or

25   not he would be a good candidate for release depends upon

1    whether he was allegedly committing any crime while he was on

2    probation.  And so since we don't know specifically what he is

3    even alleged to have done, it's somewhat difficult to address

4    the allegations here today.

5              THE COURT:  All right.

6              MR. SALSBERG:  However, I would say this, which is

7    that Mr. Chatman is really a lifelong resident of the City of

8    Boston, except for the times when he's been out of state to go

9    to college.  He went to Monroe Community College in New York

10   after taking a gap year after being a high school basketball

11   star at Charlestown High School.  When I say "star," that's

12   really my words.  He doesn't -- he's too humble to really refer

13   to himself as a star, but he was a point guard.  I just asked

14   him today what's the highest number of points you ever scored

15   in a game, he said 35, and he was able to go to --

16             THE COURT:  That's lost on me, Mr. Salsberg, but I'll

17   take your word for it.

18             (Laughter.)

19             MR. SALSBERG:  Well, you can consult with Mr. Garvin.

20   Thirty-five more points than most people would be able to score

21   if you're in this courtroom.  Let's put it that way.

22             But he got a scholarship to go to Ohio University --

23             THE COURT:  Right.  I have this...

24             MR. SALSBERG:  -- which is, as you know, a very, you

25   know -- I don't know, it's a highly reputable school in Ohio,

1    and he was doing well there, and then the coach, who really

2    pretty much brought him there who was local from Boston,

3    announced to the team he would be leaving.  He ended up going

4    to Bryant University to coach there.  And as the coach was

5    leaving and the staff was leaving and they were arranging

6    things like study halls and so forth for the team, the team

7    started kind of disbanding.  It was kind of his new family,

8    because as you can see by what's in the record, you know, he

9    was orphaned at a young age and has really been supported by

10   his extended family, including his grandmother.

11          So anyway, his basketball family was disintegrating,

12   and then he left school, hoped to go to Northeastern, and owed

13   $3300 to Ohio, so he couldn't get a transcript and he didn't

14   have that money, and that stood in his way of transferring to

15   Northeastern.

16          What's a little bit missing from this report, in terms

17   of his supporting himself, however, is that he was in a club in

18   Boston -- unless I just missed it when I read it quickly here,

19   he actually had a couple of settlements, a personal injury

20   case, because he was --

21          THE COURT:  A car crash and --

22          MR. SALSBERG:  And he was injure -- oh, it's in there?

23          THE COURT:  Yeah.

24          MR. SALSBERG:  I must have just missed it.  And also a

25   settlement from being stabbed in a club in Boston.  So he had

1    legitimate money.

2          He had also worked, you know, occasionally, with this

3    particular cousin, Joseph Chatman, who is a teacher.  I've

4    spoken to Mr. Chatman a few times.

5          THE COURT:  Is he present in court today?

6          MR. SALSBERG:  Unfortunately, the situation is this,

7    which is that -- unfortunately for Antonio Chatman, his cousin

8    is an AAU coach, which during the summer there are these

9    basketball programs, and he's out of state, I believe he's in

10   Florida, and is going to be there for the next pretty much

11   couple of weeks, maybe a little bit less.  Maybe another ten

12   days.

13         THE COURT:  And is not willing to at least pay for the

14   landline, according to this report?

15         MR. SALSBERG:  Well, he doesn't -- I don't think he

16   wants to pay for the landline, but certainly he's agreeable to

17   have a landline, and Mr. Chatman has other resources.  It's

18   really just $40 a month.  So it's not a question of coming up

19   with a lot of money.  He has other -- he has a girlfriend.  He

20   has his grandmother.  He certainly can come up with the money

21   to have the landline put in, which he can have arranged as soon

22   as Mr. Chatman is back.

23         It just seems like a perfect situation, as far as

24   somebody in Mr. Chatman's position right now, Antonio Chatman's

25   position, which he has a close relative who is single, has an

1     extra bedroom, and is willing to take him in.  And he doesn't

2     live in Boston, he lives in Everett.  So if he's on some kind

3     of electronic monitoring, then he wouldn't be anywhere near the

4     area which seems to be the focal point of this whole case,

5     which is Columbia Point or Harvard Point, whatever the current

6     name is of the housing development.

7                THE COURT:  Depends on your generation.

8                MR. SALSBERG:  Right.  They changed the name.  Yeah.

9           So in any event, you know, he's otherwise somebody

10    who -- as you can see by his background, he's been able to be

11    successful as a basketball player, did well, you know,

12    acceptably, in any event, at college, went from one college to

13    another college, you know, from community college to Ohio

14    University, and he's a very polite, respectful, you know,

15    individual, your Honor, in terms of just seeing him today with

16    his -- speaking to Ms. Walls, and there's no real reason to

17    think that he wouldn't comply.

18          At the moment, his guidelines, I don't -- you know, of

19    course I don't know what all the discovery is, but his

20    guidelines do not look like they're something that one would

21    start running away from.  And where is he going?  You know,

22    he's not someone who -- he doesn't have the resources to pay

23    for -- you know, to get this transcript and get all that going

24    when he could have, perhaps, switched over to Northeastern, and

25    he has not -- has no place to flee to, and I believe when he

1   was arrested, what I understand is that he was at his cousin's,

2   you know, Joseph Chatman, and when the police arrived he was

3   kind of walking up the stairs, came downstairs and identified

4   himself; didn't try to run away that I'm -- unless --

5            MS. CUMMINGS:  This is after running and hiding from

6   the police for five days.

7            THE COURT:  All right.  No interruption.

8            Well, I think, Mr. Salsberg, as to your client, and

9   Mr. Barron, as to your client, you both shifted the burden

10  minimally, I will say, but enough for the Government to have to

11  put on some evidence.

12           MS. CUMMINGS:  I call Detective Greg Brown.

13           THE COURT:  Please come forward and be sworn.

14           (Pause.)

15           (The Witness was sworn.)

16           THE COURT:  And as before, I'll just ask you to speak

17  into the microphone and keep your voice up.

18           THE WITNESS:  Yes, your Honor.

19           **DIRECT EXAMINATION OF DETECTIVE GREGORY BROWN**

20  **BY MS. CUMMINGS:**

21  **Q.**   Good morning, Detective.

22  **A.**   Good morning.

23  **Q.**   Could you just introduce yourself for purposes of the

24  record, spelling your first and last name, and state where

25  you're employed.

1    **A.**    Good morning.  My name is Gregory Brown, G-R-E-G-O-R-Y

2    B-R-O-W-N.  I'm a detective with the Boston Police Department,

3    Special Investigations Unit.

4    **Q.**    And how long have you been with the Boston Police

5    Department?

6    **A.**    Twenty-seven years.

7    **Q.**    And what's your role in the Special Investigations Unit?

8    **A.**    I'm a detective.  We conduct investigations of criminal

9    organizations and individuals throughout the City of Boston, as

10   well as the Metro Boston area.

11   **Q.**    And are you familiar with an operation called Operation

12   Rising Tide?

13   **A.**    Yes, I am.

14   **Q.**    And what was your role in that investigation?

15   **A.**    I was a co-case agent in that case.

16   **Q.**    And what does that mean, what did you do?

17   **A.**    Assisted with the preparation of the affidavits,

18   identified targets, monitored the wire taps, conducted

19   surveillance.  An array of things.

20   **Q.**    I'm showing you what I've asked to be admitted as

21   Exhibit 1, Government's Exhibit 1.

22          MS. CUMMINGS:  And, your Honor, there's pictures of

23   the other defendants that were on today and information.  I'm

24   just going to direct Detective Brown to Mr. Funches' and

25   Mr. Chatman's information.

1    BY MS. CUMMINGS:

2    **Q.**    Are you familiar with this?

3    **A.**    Yes, I am.

4    **Q.**    And what is this document?

5    **A.**    Basically, it's a summary of the investigation pertaining

6    to each target.

7    **Q.**    And are you familiar with an individual by the name of

8    Deronn Funches?

9    **A.**    Yes, I am.

10   **Q.**    Do you see him in the courtroom today?

11   **A.**    I do.

12   **Q.**    Could you point him out and just describe an article of

13   clothing he's wearing today.

14   **A.**    He's wearing the khaki.  He's the third person in from

15   your left -- your right.  Your right, actually.

16   **Q.**    Other than khaki, can you --

17   **A.**    Low-cut haircut.  Seated between Mr. Gaines and

18   Mr. Williams.

19           MS. CUMMINGS:  Your Honor, if the record could reflect

20   Detective Brown identified Mr. Funches.

21           THE COURT:  So noted for the record.

22   BY MS. CUMMINGS:

23   **Q.**    And were you familiar with Mr. Funches prior to Operation

24   Rising Tide?

25   **A.**    Yes, ma'am.

1  **Q.**   How is it you were familiar with Mr. Funches?

2  **A.**   From my work in the City of Boston.

3  **Q.**   And had you had occasion to speak with Mr. Funches before?

4  **A.**   Not personally, no.

5  **Q.**   And how is it you became familiar with him during

6  Operation Rising Tide?

7  **A.**    Through the investigation we were conducting, reports,

8  wiretap intercepts, surveillance.

9  **Q.**   And did you intercept Mr. Funches during Operation Rising

10  Tide?

11  **A.**    Yes.

12  **Q.**   And who was Mr. Funches speaking to when you intercepted

13  phone calls with him?

14  **A.**    David --

15      MR. BARRON:  I'm going to object, your Honor, until we

16  have a foundation for how we were able to identify Mr. Funches

17  as a party in the conversation.

18      THE COURT:  Overruled.

19  **A.**    Mr. Funches was speaking to David Jones and Demetrius

20  Williams.

21  **Q.**   And how is it you were able to identify Mr. Funches?

22  **A.**    Through his phone number and through surveillance, and

23  video.

24  **Q.**   And what was Mr. Funches' relationship with Mr. Jones and

25  Mr. Demetrius Williams?

1          MR. BARRON:  Your Honor, I've got to object for a

2   reason, if I may.  Sorry to interject.  But I did request

3   Jencks, I did it over a week ago, I did it in writing, and none

4   of this was in the Jencks material.

5          MS. CUMMINGS:  You got Jencks.

6          MR. BARRON:  So I don't know how to conduct the

7   hearing.

8          THE COURT:  Well, you'll have the opportunity to

9   cross-examine and to raise it on argument.

10          MR. BARRON:  Thank you, your Honor.

11          THE COURT:  You're welcome.

12          MS. CUMMINGS:  And, your Honor, just for purposes of

13   the record, the Government has made clear to every defense

14   attorney that we are working getting discovery out, which is

15   what Mr. Barron is talking about, by the 16th of July for the

16   first round, and the second (inaudible).  He has received

17   (inaudible) of Detective Brown.

18   BY MS. CUMMINGS:

19   **Q.**   And what was Mr. Funches' relationship with David Jones?

20   **A.**   They were friends.

21   **Q.**   And what was his relationship with Demetrius Williams?

22   **A.**   They appeared to be friends on a friendly basis also.

23   Oftentimes they spoke about drug deals.

24   **Q.**   Did Mr. Funches go by a nickname that he was also

25   identified as?

1    **A.**    Yes.

2    **Q.**    What was that?

3    **A.**    Slim or Dealz, Slim Dealz.

4    **Q.**    And during the course of the wire intercepts of Demetrius

5    Williams' phone, do you have an approximate amount of amount

6    and type of drug Mr. Funches was involved in acquisition and

7    distribution of?

8    **A.**    Yes, ma'am.

9    **Q.**    What is that?

10   **A.**    Mr. Funches was involved with 906 grams of cocaine over

11   the Demetrius Williams wiretap.

12   **Q.**    That's just limited to the wiretap; is that correct?

13   **A.**    Yes, it is.

14   **Q.**    And, Detective Brown, are you aware as to whether or not a

15   search warrant was executed on June 18, 2015 at a residence

16   associated with Mr. Funches?

17   **A.**    Yes.

18   **Q.**    In fact, is that where Mr. Funches was arrested?

19   **A.**    That is correct.

20   **Q.**    And what is the address of this residence?

21   **A.**    266 Neponset Avenue.

22   **Q.**    And what was recovered from --

23          THE COURT:  Then that's Dorchester?

24          THE WITNESS:  Yes, your Honor.

25   BY MS. CUMMINGS:

1    **Q.**   What was recovered from this address?

2    **A.**   Recovered was a blue stun gun, $19,397 in U.S. currency,

3    marijuana, a digital scale, a .45 caliber magazine loaded with

4    eight rounds of ammunition, a bag with assorted rounds of ammo,

5    .22 caliber rounds, .380 caliber rounds, .45 caliber rounds and

6    9 millimeter caliber rounds.  Also, a loaded 9 millimeter

7    magazine with a 31-round capacity, a loaded Glock 19

8    9 millimeter pistol and a Taurus .45 caliber loaded handgun.

9    **Q.**   Thank you.

10        Now, Detective Brown, turning your attention to what's

11   been marked Page 7 of Exhibit 1, this makes reference to

12   Antonio Chatman.

13        Are you familiar with Mr. Chatman?

14   **A.**   Yes, I am.

15   **Q.**   And do you see him in the courtroom today?

16   **A.**   I do.

17   **Q.**   Could you just point him out and describe something that

18   makes him stand out from the rest of the --

19   **A.**   He's seated behind you, has the brown long-sleeve shirt

20   beneath his top.

21        MS. CUMMINGS:  Your Honor, if the record could reflect

22   Detective Brown identified Mr. Chatman.

23        THE COURT:  So noted for the record.

24   BY MS. CUMMINGS:

25   **Q.**   How are you familiar with Mr. Chatman?

**A.**   I know Mr. Chatman, as Mr. Salsberg said, from his

basketball days at Charlestown, as well as from working the

City of Boston.

**Q.**   And did you become familiar with Mr. Chatman during your

work on Operation Rising Tide?

**A.**   I did.

**Q.**   And how is that?

**A.**   Through wiretap intercepts and surveillance.

**Q.**   And whose phone specifically did you intercept Mr. Chatman

on?

**A.**   Willy Berry's.

**Q.**   And did any of those intercepts involve drug activity?

**A.**   Yes.

**Q.**   And what was the nature of that drug activity?

**A.**   Mr. Chatman would purchase fingers of heroin from Willy

Berry.

**Q.**   And how much is a finger of heroin?

**A.**   Ten grams.

**Q.**   And based on your training and your experience, 27 years

with the Boston Police Department, what's a dose of heroin, for

lack of a better term?

**A.**   A dose, 0.3, 0.2 grams.

**Q.**   Of heroin?

**A.**   Yes.

**Q.**   And what was the total amount of heroin Mr. Chatman

1   purchased just on the wiretaps?

2   **A.**   Forty grams of heroin.

3   **Q.**   Did you review videos during the course of your -- rap

4   videos during the course of your investigation?

5   **A.**   Yes.

6   **Q.**   Was Mr. Chatman on any of those?

7   **A.**   Yes.  He was on several, yes.

8   **Q.**   And do you see the three photographs on Page 7?

9   **A.**   I do.

10   **Q.**   Do you recognize those?

11   **A.**   I do.

12   **Q.**   What are they?

13   **A.**   They are still photos from a rap video that was placed on

14   YouTube, I believe, in late 2014 with Tony Berry, Antonio

15   Chatman and Vandell Woods (PHONETIC).

16   **Q.**   And which of the three photographs is Mr. Chatman depicted

17   in?

18   **A.**   He's the one in the middle holding an assault-type rifle.

19   **Q.**   And did you listen to this rap song?

20   **A.**   I did.

21   **Q.**   And what was the gist of the song?

22   **A.**   Basically, it was about people that were cooperating with

23   law enforcement.  They were just playing grand jury statements,

24   transcripts, as well as police reports from rival gang members,

25   on the video, and offering to sell them for $20, 19.95 to be

1     exact.

2     **Q.**   Detective Brown, was it about identifying cooperating

3     witnesses or was it identified cooperating witnesses?

4     **A.**   They identified, I believe, five rival gang members.

5     **Q.**   And were they identified by name?

6     **A.**   They were.

7     **Q.**   Social Security Number?

8     **A.**   Date of birth and address.

9     **Q.**   And in fact that first picture depicted, what's that

10    individual holding?

11    **A.**   Tony Berry is holding a copy of the reports, as well as

12    the grand jury transcripts.

13    **Q.**   And the third picture, who is depicted in that picture?

14    **A.**   That's Vandell Woods and Tony Berry in that picture.

15    **Q.**   And in the video, what are Mr. Berry and Mr. -- in

16    addition to selling these grand jury minutes, what are they

17    asking be done with the information?

18    **A.**   They're asking that it be disseminated throughout the

19    neighborhoods.

20    **Q.**   And is the clip of Mr. Chatman holding the assault rifle

21    part of this clip of identifying these cooperating witnesses?

22    **A.**   That's correct.

23            MS. CUMMINGS:  I have no further questions, your

24    Honor.

25            THE COURT:  Okay.  Cross-examination.

1          MR. SALSBERG:  Thank you, your Honor.

2          May I go first?

3          THE COURT:  Yes.  It's the order in which we

4     proceeded.

5          MR. SALSBERG:  Thank you.

6          **CROSS-EXAMINATION OF DETECTIVE GREGORY BROWN**

7     **BY MR. BARRON:**

8     **Q.**   Detective Brown, I wanted to turn your attention to these

9     intercepts you've been listening to.

10         Do any of the intercepts involving Mr. Funches, do

11    they involve guns?

12    **A.**   One, that I remember.

13    **Q.**   And what did it say exactly?

14    **A.**   It was Mr. Funches received a call from Demetrius Williams

15    relative to a gentleman that he believed that was involved in

16    the death of Mr. Funches' grandfather.

17    **Q.**   In the death of Mr. Funches' grandfather?

18    **A.**   Yes.

19    **Q.**   It wasn't Mr. Funches offering a gun to anybody?

20    **A.**    Mr. Williams was offering the location of the individual

21    they believed was involved.

22    **Q.**   Who was involved in killing Mr. Funches' grandfather?

23    **A.**   Correct.  Yes.

24    **Q.**   Right.  Okay.

25         So you don't have Mr. Funches threatening anybody?

**A.**   No.

**Q.**   Now, you've known Mr. Funches for a while.

**A.**   Yes.

**Q.**   How far back does that go?

**A.**   Probably 15, 16 years.

**Q.**   And in that time, has -- well, let's see.  Let me back up for a second for those 15, 16 years.

Were you involved in putting together the affidavit that's being used as here as the detention affidavit, I think it's Document 7?

**A.**   I was involved in that, yes, sir.

**Q.**   And that document does not -- it mentions Mr. Funches once in that entire document, is that right, as being involved in some criminal activity?

**A.**   I don't believe he's referenced in the affidavit in that manner, to my memory.

**Q.**   Well, is it -- there's one reference in that affidavit to Mr. Funches buying drugs from Mr. Williams; is that correct?

**A.**   I don't recall exactly, but he's -- I believe that is referenced in that affidavit, yes.

**Q.**   But it doesn't give a time or a date or amount of drugs, right?

**A.**   No, sir.

**Q.**   Other than that, he's mentioned in the beginning of the affidavit as one of the people who was targeted by the

1    investigation?

2    **A.**    That's correct, I think he's identified that way.

3    **Q.**    And further along there's something mentioned about him

4    being from a family that's connected with CPD, Columbia Point

5    Development?

6    **A.**    That's correct, yes.

7    **Q.**    So nothing in that affidavit mentions Mr. Funches

8    threatening anybody with guns?

9    **A.**    I don't believe so.

10   **Q.**    No.

11            And nothing in that affidavit mentions Mr. Funches

12   being violent toward anybody?

13   **A.**    No, it does not.

14   **Q.**    Now, the affidavit does go on at some length about other

15   CPD defendants being involved in violence, killings, attacks on

16   people; is that correct?

17   **A.**    That's correct.

18   **Q.**    But it doesn't mention Mr. Funches in connection with any

19   of those activities?

20   **A.**    It does not.

21   **Q.**    Now, in your 16 years, has Mr. Funches been involved with

22   acts of violence using firearms against people?

23   **A.**    Not to my knowledge.

24   **Q.**    And did you familiarize yourself at all with Mr. Funches'

25   records?

1    **A.**    I've reviewed it, yes.

2    **Q.**    Yeah.

3           Now, he doesn't have -- he has one default in his

4    entire record, is that right, his entire arrest and court

5    record?

6    **A.**    I really don't recall.

7    **Q.**    But he doesn't have a history of defaults in that record,

8    does he?

9    **A.**    I don't recall Mr. Funches having a default record.

10   **Q.**    Would it help you if I gave you a copy of it?

11   **A.**    Yes.

12           MR. BARRON:  May I approach, your Honor?

13           THE COURT:  You may, and you need not ask again.

14           MR. BARRON:  Pardon?

15           THE COURT:  You may, and you need not ask again.

16           MR. BARRON:  Thank you, your Honor.

17           (Pause.)

18   **A.**    I've reviewed the record.  I didn't notice any defaults.

19   **Q.**    Right.  Thank you.

20           Now, your review of the record reveals, does it not,

21   there's a 1995 conviction for Mr. Funches having distributed

22   some kind of narcotic?

23   **A.**    That's correct, sir.

24   **Q.**    Do you know exactly the amount that was involved or

25   approximately the amount that was involved in that conviction?

**A.**    I do not.

**Q.**    How old was he at the time?

**A.**    Probably a juvenile.  I'm not...

**Q.**    And the other is an ABPO, assault and battery on a public official.

          Is that the other conviction on his record?

**A.**    Could I review it again?

**Q.**    Yes, of course.  I was just wondering if you knew anything about that.  I know there's a pending question.

**A.**    Thank you.

          (Pause.)

**A.**    The Land District Court, I wouldn't know anything about that one.

**Q.**    Oh, you don't know anything about that one?

**A.**    No, sir.

**Q.**    I'll leave that there with you for the moment.

**A.**    Okay.

**Q.**    The affidavit mentions people in leadership roles in the CPD; is that correct?

**A.**    Yes, sir.

**Q.**    But it doesn't mention Mr. Funches being in a leadership role?

**A.**    That's correct.

**Q.**    And you're not saying that he's in a leadership role, are you?

1   **A.**   I'm not.

2   **Q.**   Well, he's not in a leadership role and we don't connect

3   him with acts of violence against any particular person.

4           Is there any reason you think that Mr. Funches is

5   going to flee or leave the jurisdiction?

6           MS. CUMMINGS:  Your Honor, I'd object.  I don't know

7   what Detective Brown's opinion of Mr. Funches' ability to --

8           THE COURT:  Calls for speculation.  Sustained.

9   BY MR. BARRON:

10  **Q.**   Do you know of any preparation Mr. Funches has made to

11  leave the jurisdiction?

12  **A.**   I do not, sir, no.

13  **Q.**   In your 15, 16 years of knowing Mr. Funches, have you

14  known him to leave the jurisdiction for any reason?

15  **A.**   I've always known him to be in the Dorchester area of

16  Boston, or Roxbury area.

17  **Q.**   You don't know of him being personally involved in any

18  criminal activities out of state?

19  **A.**   I do not.

20  **Q.**   And you don't know of him having any contacts with people

21  in a foreign country?

22  **A.**   I wouldn't know that, but no, I don't know about that,

23  sir.

24  **Q.**   Well, you've done surveillance on him, certainly.

25  **A.**   Yeah.  I've never seen him with any people from foreign

1    countries.

2    **Q.**   Right.  Okay.

3         And you haven't -- have you known him to travel

4    outside the United States?

5    **A.**   I do not.

6    **Q.**   Have you known him to travel outside the New England area?

7    **A.**   No, he doesn't.  He makes, you know, visits down south

8    like everyone else to Florida and that area.

9    **Q.**   Right.  And he's gone maybe to New York occasionally?

10   **A.**   Yes.

11   **Q.**   But he hasn't gone to California?

12   **A.**   Not to my knowledge.

13        MR. BARRON:  Thank you, your Honor.

14        THE COURT:  Mr. Salsberg.

15        MR. SALSBERG:  Thank you, your Honor.

16        THE COURT:  You're welcome.

17        **CROSS-EXAMINATION OF DETECTIVE GREGORY BROWN**

18   **BY MR. SALSBERG:**

19   **Q.**   You're a detective; is that correct?

20   **A.**   Correct.

21   **Q.**   So, Detective, were you familiar with Antonio Chatman

22   before this investigation?

23   **A.**   Yes, sir.

24   **Q.**   And you said you were familiar with him as a basketball

25   player; is that right?

1   **A.**   Yes.  I know Mr. Chatman's family as well.

2   **Q.**   So how is it you're familiar with him as a basketball

3   player, did you go to any games he played in?

4   **A.**   I believe I went to a few games that he played in, yes.

5   **Q.**   Now, he played for Charlestown High School?

6   **A.**   Correct.

7   **Q.**   And they were the state champions for three years while he

8   was on the team?

9   **A.**   Yes.

10  **Q.**   And did you know any other players who were on the team?

11          MS. CUMMINGS:  Your Honor, objection.  Relevance.

12          THE COURT:  He may have it.

13  **A.**   I'm familiar with a couple guys that was on the team,

14  including Mr. Chatman's cousin, Joseph.

15  **Q.**   So you know Mr. -- you were sitting here when I was

16  addressing the Court about Joseph Chatman; is that right?

17  **A.**   Yes.

18  **Q.**   And so you know who Joseph Chatman is?

19  **A.**   Yes, I do.

20  **Q.**   And do you know him to have been involved in any criminal

21  activity at any time?

22  **A.**   No.

23  **Q.**   And do you know him to currently be a teacher -- do you

24  personally know that he's a teacher?

25  **A.**   I know that he's involved in the school system.  I believe

1    that he is a teacher, yes.

2    **Q.**   Now, when Mr. Antonio Chatman was in high school, you were

3    a Boston Police Detective at that time?

4    **A.**   Correct.

5    **Q.**   And did you know him at that time to be involved in any

6    criminal activity?

7    **A.**   I just knew him to be involved in basketball back then,

8    yes.  That's it.

9    **Q.**   I'm sorry?

10   **A.**   I just know him to be involved with basketball back then.

11   **Q.**   And when was the first time you were alerted to his name

12   as being involved in any alleged criminal activity?

13   **A.**   Probably about four, five years ago.

14   **Q.**   And when did you start doing the wiretaps on Willy Berry's

15   phone?

16   **A.**   I believe it was December, I believe (inaudible) December

17   2014, I believe it was.

18   **Q.**   And so that would have been after the time that

19   Mr. Antonio Chatman was placed on probation?

20   **A.**   That's correct.

21   **Q.**   And how did you actually -- your testimony today is that

22   you've identified Antonio Chatman's name as being somebody

23   talking to Willy Berry.

24   **A.**   Yes.

25   **Q.**   And how did you identify Antonio Chatman as that person

1   who was talking to Willy Berry?

2   **A.**   I had previously intercepted Mr. Chatman on another

3   wiretap we had conducted in the summer of 2014.  We had his

4   phone number, had him on surveillance for a prior wiretap.

5   **Q.**   And no charges ever arose out of that?

6   **A.**   No.

7   **Q.**   And how did you identify his actual voice?

8         You're saying it's his voice, this man sitting here in

9   court, that it's his voice on the phone talking to Willy Berry?

10  **A.**   As I mentioned, we identified Mr. Chatman previous.  He

11  was intercepted on another wiretap and identified.  I've heard

12  his voice on videos where he's talked, on several rap videos.

13  It's the same person, same voice.

14  **Q.**   So that's the way in which you've identified it being his

15  voice talking to Willy Berry?

16  **A.**   It was one of the methods.  Like I mentioned, we had

17  previously intercepted him prior to him talking to Willy Berry.

18  **Q.**   So is it just based on your voice recognition of his voice

19  that you say he was the person talking to Willy Berry?

20  **A.**   He was the person that I identified from the voice.  He's

21  the person that showed up.  He was the person that we put his

22  phone in his hand by calling it.

23  **Q.**   So when you say that he showed up, where are you saying

24  that Antonio Chatman showed up?

25  **A.**   76 Radcliffe Street in Dorchester.

1   **Q.**   And what was happening at 76 Radcliffe Street?

2   **A.**   He was purchasing heroin.

3   **Q.**   Did you actually observe him purchasing heroin?

4   **A.**   He was going inside the house once he arrived.  So no, I

5   didn't visually observe him, no.

6   **Q.**   You saw him at some point enter that house?

7   **A.**   Yes.

8   **Q.**   And how long was he inside that house?

9   **A.**   A very short time.  He was -- oftentimes he would arrive

10   in livery cars and the livery car would wait for him.

11   **Q.**   So when you say "oftentimes," how many times did you

12   observe him going into that house?

13   **A.**   I believe on three different occasions that I observed

14   him.

15   **Q.**   And how many altogether that law enforcement observed him?

16   **A.**   I really don't know.

17   **Q.**   All you saw, you say, is three times he was going into

18   that particular house?

19   **A.**   Yes.

20   **Q.**   And what kind of a house is that?

21   **A.**   It's a three-family house.

22   **Q.**   And you couldn't tell once he walked through the front

23   door which apartment he went into?

24   **A.**   Well, at the time, Willy Berry's grandmother was living on

25   the first floor alone, the second floor was vacant, and Willy

1   Berry lived on the third floor.

2   **Q.**   And did you see Mr. Chatman exit on those occasions with

3   anything in his hand?

4   **A.**   No.

5   **Q.**   And you never saw Mr. Chatman ever transact anything, as

6   in taking something from his hand, handing it to someone else,

7   and getting money back?

8   **A.**   No, sir.

9   **Q.**   So you've never seen him actually conduct any kind of an

10   alleged drug transaction?

11   **A.**   No, I did not.

12   **Q.**   And was he ever seized with any contraband of any sort in

13   this whole investigation?

14   **A.**   No, he was never stopped.

15   **Q.**   He was never stopped at any time?

16   **A.**   No, sir.

17   **Q.**   And when he was arrested, he was searched, correct?

18   **A.**   That would have been protocol, yes, sir.

19   **Q.**   And you're not aware of him ever having any kind of drugs

20   or other contraband on him when he was stopped and arrested?

21   **A.**   Not to my knowledge, he did not have any contraband.

22   **Q.**   And during this whole investigation that was conducted of

23   the Columbia Point Dawgs, was Mr. Chatman ever known to have

24   threatened anybody?

25   **A.**   Other than the video participation, no.

1    **Q.**   So when you say "the video," was anybody specifically

2    threatened by Mr. Chatman where he said he was going to get

3    anybody or do something to somebody?

4    **A.**   Where he said that?

5    **Q.**   Yeah.

6    **A.**   Not where he said that, no.

7    **Q.**   What did he actually say in these videos?

8    **A.**   Sir, I really don't recall what he said in the video.  You

9    can watch it, it's on YouTube, and you can find out.

10   **Q.**   It was on YouTube?

11   **A.**   Yes.

12   **Q.**   So it was out there for all the public to see?

13   **A.**   Exactly.

14   **Q.**   And was he involved in any kind of production of rap

15   videos that were entertainment rap videos?

16   **A.**   I believe Mr. Chatman does have a rap street name, yes,

17   that he uses to promote videos or to promote rap music.

18   **Q.**   To promote rap music?

19   **A.**   Yes.

20   **Q.**   And so he makes rap music in part as a career; is that

21   correct?

22   **A.**   I'm not certain whether it's a career or whether it's a

23   hobby, but he does engage in it.

24   **Q.**   And so rap music per se is not something bad or evil, is

25   it?

1    **A.**   It is not.

2    **Q.**   And did you listen to any of the rap videos that he

3    engaged in producing other than the ones that you refer to here

4    today?

5    **A.**   I believe I've seen one or two of Mr. Chatman's videos.

6    **Q.**   And so they use the kind of language that some people

7    might be offended by, right?

8    **A.**   Some people could be offended by it, yes, sir.

9    **Q.**   But it's something that's popular in certain cultures;

10    isn't that right?

11    **A.**   Correct.

12    **Q.**   And do you know the name of his -- was it his company?

13    **A.**   No.

14    **Q.**   Do you know whose company it was?

15    **A.**   Mr. Funches was very involved in it, so I believe he has

16    some ownership in it.

17    **Q.**   And when you say that there were grand -- were there grand

18    jury minutes or police reports?

19    **A.**   They were grand jury transcripts, homicide reports, as

20    well as other interviews.

21    **Q.**   And were you actually able to match up what you saw in the

22    video with something specific?

23    **A.**   Yes.

24    **Q.**   And that hasn't been provided in the discovery so far in

25    that Jencks material of yours; is that right?

1          The Jencks material -- let me step back.

2          The Jencks material that was produced so far involved

3     reports that have your name on it?

4     **A.**   That's correct.

5     **Q.**   Right.

6          Did you include copies of the grand jury -- do you

7     know if these grand jury minutes or police reports were

8     included in those materials that were handed over?

9     **A.**   No, they were not.

10    **Q.**   And can you actually read the grand jury minutes on the

11    videos?

12    **A.**   Yes, sir.

13    **Q.**   Are the grand jury minutes -- whose hand are they held in?

14    **A.**   They're held in Vandell Woods' and Tony Berry's, to my

15    memory.

16    **Q.**   Not Mr. Chatman?

17    **A.**   No.

18    **Q.**   And he didn't voice any specific threats in any of these

19    videos to any individual himself, did he?

20    **A.**   Other than holding an assault rifle, no.

21    **Q.**   Well, when you say it's an assault rifle, do you know if

22    it's a real assault rifle?

23    **A.**   That I don't know.

24    **Q.**   So it could simply be something that is a toy or a replica

25    or something like that; is that correct?

1    **A.**   It could be a replica, a prop.

2    **Q.**   And so just to turn -- you're familiar with rap music in

3    general, correct?

4    **A.**   I am.

5    **Q.**   And sometimes in all different sorts of rap music, people

6    display things that looks like weapons, correct?

7    **A.**   Yes.

8    **Q.**   And they aren't necessarily weapons, right?

9    **A.**   Some of them are, but they're just modified so they're

10   not, you know -- they're not fireable.

11   **Q.**   And you never found any -- what you saw in the video, did

12   you ever find those items that looked like a weapon?

13   **A.**   We never conducted a search of Mr. Chatman's residence.

14   **Q.**   I'm not talking about just on Mr. Chatman.  In any of the

15   searches, were you able to match up that particular toy or

16   replica or whatever it was to any particular item that you

17   found?

18   **A.**   We seized a weapon from Tony Berry that's very similar to

19   that weapon that's playing in the video.

20   **Q.**   It looks very similar to you?

21   **A.**   It does.

22   **Q.**   Right.  But you can't match it up with any precision;

23   isn't that correct?

24   **A.**   That's correct.

25   **Q.**   Now, do you know when it was that Antonio Chatman was

1    arrested?

2    **A.**   I believe it was June of 2014, I believe it was.

3    **Q.**   And there's some allegation that he --

4    **A.**   I'm sorry, which arrest were you talking about, do you

5    mean the arrest --

6    **Q.**   I'm sorry, I'm talking about his arrest in this particular

7    case.

8    **A.**   He was arrested over the weekend, I believe maybe four or

9    five days after the 18th.  Maybe the 22nd or something like

10   that.  I'm not certain of the exact date.

11   **Q.**   Did you hear some reference of the Government that he was

12   running?

13   **A.**   He was at his cousin's house.

14   **Q.**   He wasn't physically running away from the police?

15   **A.**   Well, we spoke to him on the 18th and notified him of the

16   warrant that was outstanding.  He stated that he would come in

17   that particular day.  He was called several more times, asked

18   what time would he like to turn himself in.  He never replied

19   to that.  And then afterwards his phone was off, so we couldn't

20   get in touch with him.

21   **Q.**   So who spoke to him, did you speak to him?

22   **A.**   Special Agent Ronny Rushnick (PHONETIC) spoke to him.

23           THE COURT:  The name?

24           THE WITNESS:  Ronny, Ronald, Rushnick.

25   BY MR. SALSBERG:

1    **Q.**   And is there a report of that particular phone

2    conversation?

3    **A.**   I believe you have to speak with Special Agent Rushnick.

4    I believe he would have made one.

5    **Q.**   But that hasn't -- to your knowledge, that hasn't been

6    produced in any sort of discovery at this point; is that right?

7    **A.**   That's correct.

8    **Q.**   And so as far as you know, aside from Mr. Antonio Chatman

9    going to college out of state, are you aware of his leaving the

10   State of Massachusetts?

11   **A.**   No.  I've always known him to reside with his grandmother,

12   actually.

13   **Q.**   And do you know his grandmother personally?

14   **A.**   I do not.

15   **Q.**   How did you find where he was in Everett?

16   **A.**   That would be telling secrets.  Through investigation.

17   **Q.**   Who gave you the information?

18          MS. CUMMINGS:  Your Honor, objection.

19          THE COURT:  Sustained as to the identity of the

20   person.

21   BY MR. SALSBERG:

22   **Q.**   Now, when you went -- were you present when Mr. Chatman

23   was arrested?

24   **A.**   I was not, no, sir.

25   **Q.**   Do you have any -- is there any reference to his

1   attempting to run from the police when he was arrested?

2   **A.**   I was told he was very compliant.

3   **Q.**   You were told he was very compliant?

4   **A.**   Yes.

5   **Q.**   And do you know if his -- was he found in the apartment

6   building where his cousin Joseph Chatman lives in Everett?

7   **A.**   Yes, sir.

8   **Q.**   And do you know if that apartment was ever searched?

9   **A.**   Not to my knowledge, no.

10          (Pause.)

11          MR. SALSBERG:  May I have a moment, please, your

12   Honor?

13          THE COURT:  Take your time.

14          MR. SALSBERG:  Thank you.

15          (Pause.)

16          MR. SALSBERG:  I'm sorry, one more question.

17          (Pause.)

18          MR. SALSBERG:  Nothing further, your Honor.  Thank

19   you.

20          MR. BUDREAU:  Your Honor, may I?

21          THE COURT:  You may.

22          MR. BUDREAU:  Thank you, your Honor.  I'll be short.

23          **CROSS-EXAMINATION OF DETECTIVE GREGORY BROWN**

24   **BY MR. BUDREAU:**

25   **Q.**   Detective Brown --

1          THE COURT:  Famous last words of lawyers:  One more

2     question.

3          (Laughter.)

4          MR. BUDREAU:  Two hours later.

5     BY MR. BUDREAU:

6     **Q.**  Detective Brown, Jim Budreau on behalf of Mr. Hopkins.

7          MS. CUMMINGS:  Your Honor, Mr. Hopkins isn't on for a

8     hearing today.

9          MR. BUDREAU:  It's true, he's not, but I'd hate to

10    miss the opportunity.

11         MS. CUMMINGS:  Well, you didn't give it to other

12    defense attorneys who tried the same exact thing.  I don't

13    think Mr. Budreau should be allowed the opportunity.  The

14    Government didn't present anything on direct, so I don't

15    know -- he's got nothing to cross on.

16         MR. BUDREAU:  Oh, I have lots to cross on.

17         I would keep it short.  I just want to ask a couple of

18    questions about what's in the affidavit.

19         MS. CUMMINGS:  Your Honor, it's premature and it's

20    pointless today.

21         THE COURT:  Well, I have to say, I've made the same

22    ruling with others, so at this time if you wish to have a

23    hearing, I'll give it to you.

24         MR. BUDREAU:  Can I have a hearing right now?

25         THE COURT:  No, you cannot have a hearing right now.

1          (Laughter.)

2          MR. BUDREAU:  Thank you, your Honor.

3          THE COURT:  Any redirect?

4          MS. CUMMINGS:  No, your Honor.

5          THE COURT:  Detective Brown, you may step down.

6          THE WITNESS:  Thank you, your Honor.

7          THE COURT:  Further witnesses for the Government?

8          MS. CUMMINGS:  No, your Honor.

9          THE COURT:  Witnesses for the defendants?

10          MR. SALSBERG:  Nothing at this time, your Honor, but

11   the defendant would offer the Jencks material under seal.  If I

12   may do that later if it becomes necessary, I think giving

13   electronic copy to your Honor.

14          THE COURT:  Any exhibits to be made part of the record

15   here?

16          MS. CUMMINGS:  Only the exhibit the Government

17   offered, your Honor.

18          THE COURT:  Okay.  Government Exhibit 1 made part of

19   the record.

20          **(Exhibit No. 1 marked.)**

21          THE COURT:  I think something has been left on the

22   witness bench.

23          MR. BUDREAU:  Yes.  I'll get that.

24          MS. CUMMINGS:  It's the record of Mr. Funches.

25          THE COURT:  All right.  And that's a criminal record

1    of which I can take judicial notice and will not be made part

2    of the record.

3            Ms. Salsberg?

4            MR. SALSBERG:  Well, just presumably Mr. Chatman's

5    record will be part of your Honor's consideration.

6            THE COURT:  It is.  It's attached to the Pretrial

7    Services Report and I'll review it.

8            MR. SALSBERG:  Other than that, the only witness I

9    would be presenting would be the person who would be available

10   as a third-party custodian, who is Joseph Chatman, who as I

11   represented earlier is not here today.

12           THE COURT:  Well, when will he be available?

13           (Pause.)

14           MR. SALSBERG:  I believe the first day he'll be back

15   would be Monday the 20th.

16           THE COURT:  All right.  Are you willing to take

17   voluntary detention without prejudice until that date?

18           MR. SALSBERG:  I believe so, your Honor.  I just want

19   to make sure.

20           THE COURT:  Sure.

21           MS. CUMMINGS:  The Government is not available on the

22   20th, your Honor.

23           THE COURT:  Okay.  Well, get together with

24   Ms. Cummings and Mr. Garvin and see if you can come up with a

25   prompt date.

1          MR. SALSBERG:  What day are you available, the 21st?

2          MS. CUMMINGS:  No, the 23rd at 11:00, I think

3     Mr. Gaines is on for.

4          THE CLERK:  Yeah, that would be the best.

5          MR. SALSBERG:  I'm going to be out of state on the

6     23rd.  I am available Monday, Tuesday or Wednesday of that

7     week.

8          MS. CUMMINGS:  Wednesday is fine.

9          MR. SALSBERG:  Wednesday, the 22nd, your Honor?

10          THE COURT:  Or we could do it in the afternoon.

11          (The Court and the Clerk conferred.)

12          THE COURT:  We have a civil trial that week, so the

13     afternoons are kind of jammed.

14          THE CLERK:  If it was Wednesday, it would have to be

15     at 3 o'clock.

16          MR. SALSBERG:  That's fine, your Honor, if that's

17     agreeable.

18          THE COURT:  It shouldn't take that long.

19          MS. CUMMINGS:  Yeah.

20          MR. SALSBERG:  No, I think it would be very brief for

21     Mr. Chatman.

22          THE COURT:  All right.  So voluntary detention until

23     that date without prejudice.

24          All right.  Mr. Barron?

25          MR. BARRON:  Your Honor, we do have Sherry Beane in

1    the courtroom.  She hasn't had an interview.  I know that

2    Probation has suggested --

3            THE COURT:  So it's premature.  So get the interview

4    done, you're here, you're available, and I trust somebody from

5    Pretrial is available.

6            All right?

7            MR. BARRON:  All right.

8            THE COURT:  So on you, voluntary detention then

9    without prejudice as well, and as soon as you have something in

10   a report, file a motion and I'll give you prompt hearing.

11           All right?

12           MR. BARRON:  All right.  Thank you.

13           MS. CUMMINGS:  Thank you, your Honor.

14           THE COURT:  Hearing nothing else, the defendants are

15   remanded to the custody of the United States Marshal Service.

16

17           (The hearing was concluded.)

18

19

20

21

22

23

24

25

## C E R T I F I C A T I O N

I, Karen M. Aveyard, Approved Federal Court Transcriber, do hereby certify that the foregoing transcript, consisting of 49 pages, is a correct transcript prepared to the best of my skill, knowledge and ability from the official digital sound recording of the proceedings in the above-entitled matter.

/s/ Karen M. Aveyard

Karen M. Aveyard

July 31, 2015

Date